## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JONATHAN MILLER,
INMATE NO. 1122960,

                              Petitioner,

       v.                                        1:04-cv-1120-WSD-JFK

MICHELLE MARTIN,

                              Respondent.

## OPINION AND ORDER

This matter is before the Court on the Magistrate Judge's Order and Final

Report and Recommendation ("R&R") [13] regarding Petitioner's Petition for Writ

of Habeas Corpus ("habeas petition") [1].  Also before the Court are Petitioner's

Objections to the Magistrate's Report & Recommendation ("Objections") [14].

Petitioner challenges, pursuant to 28 U.S.C. § 2254, the constitutionality of aspects

of the trial that led to his conviction and incarceration for felony murder.     **I.**

**Factual Background**

On November 2, 1998, Petitioner Jonathan Miller ("Miller") struck

schoolmate and neighbor Josh Belluardo, ("Belluardo") on the back of the head

after a confrontation between the two on the school bus.  After this first punch, but

before Belluardo had yet hit the ground, Miller landed a second punch.  After Belluardo reached the ground, Miller kicked him, and ran into the woods. Miller's first strike ultimately rendered Belluardo brain dead.  Two days after this attack, Belluardo was removed from life support and died.

The incident occurred immediately after the two had gotten off of the school bus.  At the time of the incident, Miller was 15 years old, and Belluardo was 13. Miller was a student at Etowah High School, and Belluardo attended B.T. Booth Middle School.  The school bus serviced both schools.

On the day of the incident, the Juvenile Court of Cherokee County filed a complaint against Miller alleging aggravated assault and aggravated battery.  After Belluardo died, the Superior Court of Cherokee County issued a warrant for Miller's arrest on the charge of felony murder.

On December 14, 1998, a grand jury indicted Miller for aggravated assault, aggravated battery, and felony murder.  The Juvenile Court dismissed its complaint.  Miller moved to remand his case to Juvenile Court, but the motion was denied.

Jury selection for Miller's trial began on April 26, 1999, six days after the tragic events at Columbine High School in Colorado.  Publicity concerning both Miller's case and the Columbine tragedy were widespread in the days approaching the trial.  There do not appear to be any media articles from the relevant time period associating the Columbine tragedy with Miller's case, even though both tragedies involved deaths caused by high-school age males.[1]

Several members of the venire had significant exposure to Miller's case through media coverage, and ten of the 66 venire members were excused for cause due to their opinions concerning Miller's guilt.  Miller moved for a continuance and change of venue, alleging that both the media coverage of his trial and the publicity and inflammatory atmosphere on the subject of teen violence following the Columbine massacre, were so prejudicial that he could not at that time be tried fairly in Cherokee County.  The court denied the motions.

On May 7, 1999, Miller was convicted of felony murder, aggravated, assault, and aggravated battery.  He was sentenced to life in prison with the possibility of parole pursuant to O.C.G.A. § 16-5-1(d), which mandates life imprisonment or

---

[1] The only news article linking the Columbine tragedy with Belluardo's death reported that Miller's counsel had moved for a continuance of the trial based on prejudice Miller's counsel thought might be caused by the Columbine tragedy.

death for anyone convicted of murder or felony murder.  After an unsuccessful motion for a new trial, Miller appealed to the Georgia Supreme Court, which affirmed his conviction and sentence.  Miller v. State, 571 S.E.2d 788 (Ga. 2002). On April 16, 2004, Miller filed the instant petition for habeas corpus pursuant to 28 U.S.C. § 2254.  The habeas petition states six grounds for relief:

1.  That the Superior Court denied Miller's Fifth and Fourteenth Amendment rights to due process, and his Eighth Amendment right to be free from cruel and unusual punishment, when it tried him as an adult;

2.  That the Superior Court denied Miller's Fifth and Fourteenth Amendment rights to due process, and his Sixth Amendment right to a fair trial, by refusing his motion to continue and permitting the trial to proceed in the wake of the Columbine tragedy;

3.  That the Superior Court denied Miller's Fifth and Fourteenth Amendment rights to due process, and his Sixth Amendment right to a fair trial, by refusing his motion to change venue, and permitting the case to proceed in the face of pervasive prejudicial media coverage;

4.  That the Superior Court denied Miller's Fifth and Fourteenth Amendment rights to due process, and his Eighth Amendment right to be free from cruel and unusual punishment, when it convicted him under the Georgia felony murder statute, which permitted the intent element to be presumed without being proven;

5.  That the Superior Court denied Miller's Fifth and Fourteenth Amendment rights to due process, and his Sixth Amendment right to be free from double jeopardy, by convicting him of both felony murder and the predicate felony of aggravated battery with identical bodies of proof; and

6.  That the Superior Court denied Miller's Fifth and Fourteenth Amendment rights to due process, his Sixth Amendment right to a fair trial, and his Eighth Amendment right to be free of cruel and unusual punishment, through the accumulation of the previously listed harmful errors.

The Magistrate Judge recommended that Miller's request for relief be denied on each of these grounds.  Miller objects to the Magistrate's recommendations.

## II.   Standard of Review

Under 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the Court is obligated to conduct a *de novo* review of the portions of the Magistrate Judge's Report and Recommendation ("R&R") to which the Petitioner

has objected.  All other portions of the R&R are reviewed for plain error.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

Under 28 U.S.C. § 2254, a federal court may issue a writ of habeas corpus for a person convicted by a state court if the state court judgment resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "Clearly established" federal law is determined by "the holdings, as opposed to the dicta, of decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000).  A state court decision is contrary to federal law when it "applies a rule that contradicts the governing law" from the holdings of Supreme Court cases or "confront a set of facts that are materially indistinguishable [from a Supreme Court case] and nevertheless arrives at a [different] result."  Id. at 405-06. A state court decision constitutes an unreasonable application of federal law when it "identifies the correct governing principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  Reasonableness is measured objectively.  Id. at 409.  Factual determinations by a state court are

presumed correct unless shown otherwise by clear and convincing evidence.  28

U.S.C. § 2254(e)(1).

## III.   Discussion

A.   <u>Ground 1: Trying Petitioner as an Adult</u>

Miller claims that his constitutional rights were violated when he was tried

as an adult.  Petitioner advances two arguments: i) that O.C.G.A.

§ 15-11-28(b)(2)(A), the Georgia statute that grants the Superior Court exclusive

jurisdiction over juveniles accused of murder, does not apply to juveniles accused

of felony murder; and ii) that Miller's transfer to the Superior Court based on the

existence of concurrent jurisdiction lacked due process because the Juvenile Court

did not hold a transfer hearing before submitting him to the Superior Court's

jurisdiction.

Miller first argues that O.C.G.A. § 15-11-28(b)(2)(A) does not apply to

juveniles convicted of felony murder.  The statute reads, in relevant part:

> The superior court shall have exclusive jurisdiction over
> the trial of any child 13 to 17 years of age who is alleged
> to have committed any of the following offenses:
> (i) Murder;
> (ii) Voluntary manslaughter;
> (iii) Rape;
> (iv) Aggravated sodomy;

       (v) Aggravated child molestation;
       (vi) Aggravated sexual battery; or
       (vii) Armed robbery if committed with a firearm.

O.C.G.A. § 15-11-28(b)(2)(A) (1998).

Miller argues that because the statute does not expressly include felony murder, but only murder, the statute does not apply to felony murder under the canon of interpretation *expressio unis est exclusio alterius* ("the expression of one thing is the exclusion of others").  In support of this argument, Miller cites several Georgia statutes distinguishing murder from felony murder.  Miller argues essentially that the Georgia Supreme Court erred when it held that the term "murder" used in § 15-11-28(b)(2)(A) "encompass[es] both felony and malice murder."  Miller v. State, 571 S.E.2d 788, 794 (Ga. 2002).

While the Court finds Miller's argument regarding the scope of § 15-11-28(b)(2)(A) thoughtful, "it is not the province of a federal habeas court to reexamine state-court determinations on state law questions."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  The Court is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Id. at 67.  In other words, "federal habeas corpus relief does not lie for errors of state law."  Lewis v. Jeffers, 497 U.S. 764, 780 (1984).  Thus, this Court is prohibited from reviewing

independently the Georgia Supreme Court's interpretation of

§ 15-11-28(b)(2)(A) unless Miller shows that interpretation clearly violates federal

law.  Miller has presented no cases to support the proposition that

§ 15-11-28-(b)(2)(A) on its face or as interpreted by the Georgia Supreme Court

operated to violate his constitutional rights.  The Georgia Supreme Court's

interpretation of § 15-11-28-(b)(2)(A) to include felony murder is not a grounds on

which to afford Miller habeas relief.

Miller next argues the Juvenile Court violated his constitutional due process

rights when it failed to conduct a hearing to determine whether his case should be

transferred to the Superior Court.  The requirement of a transfer hearing is set out

in O.C.G.A. § 15-11-30.2:

> After a petition has been filed alleging delinquency based
> on conduct which is designated a crime . . . , the court
> before hearing the petition on its merits may transfer the
> offense for prosecution to the appropriate court having
> jurisdiction of the offense if:
> (1) A hearing on whether the transfer should be made is
> held in conformity with Code Sections 15-11-6, 15-11-7,
> and 15-11-41;
> (2) Notice in writing of the time, place, and purpose of
> the hearing is given to the child and his or her parents,
> guardian, or other custodian at least three days before the
> hearing;
> (3) The court in its discretion determines there are

reasonable grounds to believe that:
(A) The child committed the delinquent act alleged;
(B) The child is not committable to an institution for the
mentally retarded or mentally ill; and
(C) The interests of the child and the community require
that the child be placed under legal restraint and the
transfer be made; and
(4) The child:
(A) Was at least 15 years of age at the time of the alleged
delinquent conduct; or
(B) Was 13 or 14 years of age and either committed an
act for which the punishment is loss of life or
confinement for life in a penal institution or committed
aggravated battery resulting in serious bodily injury to a
victim.

Miller argues that the Juvenile Court failed to comply with the process guaranteed by this statute. Miller, however, ignores that subsection (f) of the same statute states, "This Code section shall <u>not</u> apply to any proceeding within the exclusive jurisdiction of the superior court pursuant to subparagraph (b)(2)(A) of Code Section 15-11-28." (emphasis added). The Georgia Supreme Court held expressly that the Superior Court had exclusive jurisdiction pursuant to § 15-11-28-(b)(2)(A), and by the operation of § 15-11-30.2(f). Miller was thus not entitled to any transfer process, in particular the hearing Miller complains the state failed to conduct. The Juvenile Court did not fail to provide required due process by transferring Miller without a hearing.

Miller next argues that, even if the Superior Court had exclusive jurisdiction over the felony murder charge, his rights were nonetheless violated by the lack of a transfer hearing because he was constitutionally entitled to a transfer hearing before being tried as an adult, irrespective of any existing state statute.

There is no clearly articulated federal law to support Miller's position.  In Kent v. United States, 383 U.S. 541, 556-61 (1966) the Supreme Court addressed the due process rights of a juvenile transferred from juvenile court without a hearing where the statutory scheme provided that exclusive jurisdiction was vested in the juvenile court.  The Supreme Court held that a juvenile "by statute entitled to certain procedures and benefits as a consequence of his statutory right to the 'exclusive' jurisdiction of the juvenile court . . . . [is therefore] entitled to a hearing . . ." Id. at 557 (emphasis added).  In other words, juveniles have a due process right to any "procedures and benefits" granted to them by state statute, but do not have an absolute constitutional right to any specific set of "procedures and benefits."

In this case, the Georgia Supreme Court held that Miller did not have a statutory right to the exclusive jurisdiction of the Juvenile Court. O.C.G.A. § 15-11-30.2(f) states that juvenile defendants subject to the exclusive

jurisdiction of the Superior Court are, by statute, not entitled to a transfer hearing. The Georgia Supreme Court held that the Juvenile Court fulfilled its statutory obligations with respect to Miller. Kent entitles Miller only to the process guaranteed by Georgia law. According to the Georgia Supreme Court, to whose judgments concerning Georgia law this Court gives considerable deference, Miller has received that process.

Miller last argues that § 15-11-28(b)(2)(A) offends the constitution by automatically granting the Superior Court exclusive jurisdiction of certain juvenile offenses. Miller does not point to any authority clearly establishing the proposition that juvenile offenders are entitled in all cases to a hearing or other process before they can be tried as adults. Miller's habeas challenge on this ground fails.

B.    Ground Two:  Prejudicial Atmosphere Due to the Columbine Massacre

Miller next argues that the Columbine tragedy, which occurred two days prior to the start of jury selection in Petitioner's trial, created a prejudicial atmosphere for perpetrators of teenage violence which made a fair trial at that time an "absolute impossibility" for Miller. Miller argues that the influence of the Columbine tragedy aggravated the bias caused by the "widespread," "sensational," and "unrelenting" press coverage of his particular case. Miller claims the Superior

Court denied him a fair trial by denying his motion to continue the trial until the prejudicial emotions he believed to be aroused by the Columbine tragedy had cooled.

On appeal, the Georgia Supreme Court held that Petitioner's Columbine argument "was based primarily upon speculation."  Miller, 571 S.E.2d at 795. That court held that the trial court had not abused its discretion by refusing to grant a continuance.

The Sixth Amendment guarantees a fair trial to those accused of a crime. The Fourteenth Amendment safeguards this right against the states, and includes a right to be tried in an atmosphere in which it is possible for jurors to be impartial. The Sixth Amendment demands that jurors be capable of maintaining an "impartial and indifferent" mind.  Morgan v. Illinois, 504 U.S. 719, 727 (1992).  The seminal case on pretrial publicity is Sheppard v. Maxwell, 384 U.S. 333 (1966).  The Supreme Court there held that murder suspect Sam Sheppard's constitutional rights had been violated because the publicity had created "such a probability that prejudice will result."  Id. at 352.

The Supreme Court identified two types of prejudice stemming from pretrial publicity:  actual prejudice, where potential jurors admit to being biased by the

publicity; and presumed prejudice, when inflammatory and prejudicial pretrial publicity has saturated the community where the trial is held.  Rideau v. State of Louisiana. 373 U.S. 723, 726-27 (1963).  Petitioner does not advance any evidence of actual prejudice stemming from the publicity of the Columbine tragedy.  The issue, then, is whether the Superior Court committed a clear violation of federal law by denying the motion for continuance and apparently finding that the pretrial publicity of the Columbine tragedy did not create an atmosphere in which prejudice should be presumed.

In Sheppard and Rideau, the pretrial publicity that created a presumption of prejudice concerned the cases of the accused directly.  In Sheppard, for example, multiple local papers and media outlets printed several biased and inflammatory articles misconstruing the facts of the case and accusing the defendant of being a liar and a murderer.  In Rideau, the local sheriff's department videotaped and broadcast on multiple occasions a film of the defendant's confession the day after his arrest.  In both cases, the negative pretrial publicity was inflammatory and prejudicial because it was directly related to the defendant's conduct and their cases.  The publicity in both cases inundated the community with unproven "facts" which became part of the body of public knowledge, and once those "facts" were

embedded in the public mind, a fair trial was impossible.

In the present case, Miller contends that publicity concerning an entirely unrelated incident was sufficiently inflammatory to prejudice his right to a fair trial. While the Columbine shootings were widely reported, and had a profound emotional impact on people nationwide, the incident was not factually related to Miller's case. Miller does not point out any instance prior to the trial in which the media drew any connection between the events of the Columbine tragedy and his conduct on November 2, 1998.

Unlike Rideau and Sheppard, where the Supreme Court found due process violations when the media saturated the trial community with inappropriate facts or commentary about the defendants' case, Miller contends that the unrelated Columbine incident inundated the entire nation with such inappropriate bias against teens accused of violence that a fair trial could not be had anywhere at that time. There is also no clearly articulated federal right against being tried shortly after a factually unrelated, but emotionally significant, event. And, there is no evidence of bias against teens accused of committing violence. The Court thus cannot hold that the Georgia courts violated clearly articulated federal law by refusing to grant Petitioner's motion for a continuance.

C.     <u>Ground Three:  Claims of Negative Pretrial Publicity Pertaining to Miller's Case</u>

Miller next alleges that his constitutional due process and fair trial rights were violated when the court refused to grant a change of venue.  Miller argues that Cherokee County is a small community, and the media coverage concerning his case was so prejudicial and pervasive that he could not receive a constitutionally fair trial anywhere in Cherokee County.  In support of this argument, Miller notes evidence of actual bias in the venire, and a number of media reports concerning his trial.

A criminal defendant's Sixth and Fourteenth Amendment rights are violated if a change of venue request is denied where the trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere."  <u>Coleman v. Kemp</u>, 778 F.2d 1487, 1489 (11th Cir. 1985) (citing <u>Rideau v. Louisiana</u>, 373 U.S. 723, 726 (1963)).

Presumed prejudice, as noted above, occurs "when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials where held."  <u>Id.</u> at 1490 (citing <u>Rideau</u>, 373 U.S. at 726-27; <u>Murphy v. Florida</u>, 421 U.S. 794, 798-99 (1975)).  In a

community so thoroughly saturated with media bias, "jurors' claims that they can be impartial should not be believed." Patton v. Yount, 467 U.S. 1025, 1033 (1984). The petitioner must show "evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community." Coleman, 778 F.2d at 1490 (citing Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980)).

Pretrial publicity which is purely factual in nature ordinarily does not raise problems of constitutional magnitude. See Patton 467 U.S. at 1032. Constitutional concerns arise, however, when pre-trial publicity contains bias, opinion, or other persuasive influence. Id. at 1034. In other words, constitutional problems arise when the community from which the jury is to be selected is subjected to media influence that "prevaded the proceedings." Murphy, 421 U.S. at 799. The media influence must, in addition to being "pervasive," must also be inflammatory, or "utterly corrupt[ing]." Id.

Presumed prejudice is "rarely applicable . . . and is reserved for an extreme situation." Coleman, 778 F.2d at 1490. To show presumed prejudice, a petitioner must prove "(1) that a substantial number of the people in the relevant community could have been exposed to some of the prejudicial media coverage, and (2) that

the effects of the media saturation continued until the trial."  <u>Heath</u>, 941 F.2d at 1135.

Actual prejudice, by contrast, occurs when there is evidence that a venire member harboring actual bias against the defendant was seated on the jury.  If a trial court seats "any juror who should have been dismissed for cause . . . that circumstance would require reversal."  <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 316 (2000).  There is, however, "no constitutional violation where the biased venire member does not eventually sit on the jury."  <u>Heath</u>, 941 F.2d at 1132-33.

The Court has reviewed the complete transcripts of the voir dire phase of Petitioner's trial.  Voir dire began with a sixty-six (66) member venire panel. Seven (7) members of the venire were dismissed for hardship or other non-cause reasons (Jurors No. 3, 8, 9, 35, 53, 46, and 65).  Two of the seven non-cause dismissals were related to bias or partiality, because the venire members had close personal connections to the case (Juror No. 53 worked at Etowah High School, and Juror No. 9 was the parent of a prosecution witness).

The trial court questioned the venire panel generally concerning potential bias and partiality.  The results were as follows:

(1) When asked, "Have you for any reason formed and expressed any

opinion regarding the guilt or innocence of the accused?" seventeen (17) venire members (Jurors No. 4, 6-8, 14, 21, 23, 30, 36, 37, 45, 46, 51, 52, 55, 57, and 62),  responded affirmatively. (Voir Dire Transcript at 144-46) ("T").

(2) When asked by the judge "Have you any prejudice or bias resting on your mind either for or against the accused?" three (3) jurors (Jurors No. 12, 13, and 30) responded affirmatively.  (Id. at 146.)

(3) When asked by the judge "Is your mind perfectly impartial between the State and the accused?" fourteen (14) jurors responded negatively (Jurors No. 4, 6-8, 12, 21, 23, 37, 41, 51, 52, 55, 61, 62).

From these three preliminary questions, twenty-one (21) jurors, comprising 32% of the venire, indicated actual bias or partiality. (Id. at 147-48.)

The Court next allowed counsel for the parties to question individually the members of the venire.  A number of venire members acknowledged they had been exposed to pre-trial publicity concerning the case, including negative publicity on talk radio and television.  Most, however, noted that these influences were not particularly opinionated, inflammatory, or other than factual.  Several of the venire members had children in the same school system as Etowah High School.  The

Court's review of the transcripts shows that during individual questioning, twenty-six (26) venire members (Jurors No. 1, 5, 6, 7, 12, 13, 14, 16, 19, 21, 23, 25, 27, 30, 33, 36, 37, 41, 42, 45, 51, 52, 56, 58, 59, and 64) expressed either a pre-formed opinion of Miller's guilt, reservations about the presumption of innocence, or reservations concerning their ability to judge the case  impartially.  Of those, eighteen (18) (Jurors No. 1, 6, 8, 13, 14, 16, 21, 25, 30, 33, 37, 42, 51, 52, 56, 58, 59, and 64) were excused by the court, and eight (8) (Jurors No. 5, 12, 19, 23, 27, 36, 41, and 45) were considered rehabilitated by the court and qualified for the jury pool.  Most of these venire members acknowledged that pretrial publicity had played a role in their concerns.  After both sides issued peremptory challenges, Jurors No. 10, 11, 15, 18, 20, 22, 28, 31, 34, 39, 47, 49, 54, and 66 were empaneled.

Miller does not contend that any of the empaneled jurors expressed actual bias or partiality.  The Court, after reviewing the voir dire transcript, finds that none of the empaneled jurors expressed bias or partiality during the voir dire. None of the jurors accused by Miller of harboring bias, or of being wrongly considered rehabilitated by the court based on equivocal remarks about "trying" to be fair and impartial, were empaneled on the jury.  Miller is thus not a victim of

actual bias.

Regarding presumed bias, Miller has succeeded in showing (1) that a substantial number of the people in Cherokee County, and particularly venire members, could have been and were exposed to significant media coverage regarding Miller's case; and (2) that the effects of that media coverage continued until the trial.

The record does not show, however, that the media coverage was prejudicial. Although Miller cites articles discussing his case published prior to the trial, Petitioner fails to show evidence of the "barrage" of inflammatory publicity–the pervasive, "utterly corrupt[ing]" media influence--that rises to a constitutional level.[2]

---

[2] Most of the venire members had heard of Miller's case through the media. Some had not. Many venire members had pre-formed opinions of Miller from reports or gossip they had heard. Such common knowledge of a case is likely in a small community, and is not itself inherently suspicious. See Murphy, 421 U.S. at 799-803. Miller, although showing that the community was saturated with media reports about his case, offers no evidence to show that these reports were suggestive, prejudicial, or factually incorrect such that they were likely to inflame the community against him.

The court has found several passages in the voir dire testimony concerning pre-formed opinions held by venire members about Miller's guilt, that were apparently influenced by factual media reports or by unfounded community gossip. One venire member had heard that Miller used a baseball bat to attack Belluardo. None of the jurors who made these statements were empaneled, however, and these

The Georgia Supreme Court noted that "the actual pretrial publicity in this matter . . . was not inherently prejudicial, unduly extensive, prejudicially inflammatory, or reflective of a hostile atmosphere.  Miller, 571 S.E.2d at 795. This factual finding by the state court is entitled to a great deal of deference, and Miller has presented no evidence that it is incorrect.

D.    Ground Four: Conviction Without Intent

Ground Four of the petition alleges that "Petitioner is entitled to relief because he was convicted under a statute which presumed–and removed from the jury's consideration–the essential element of intent to commit the crime [of felony murder] for which he was convicted and sentenced."  Miller alleges that the lack of any finding of intent violated his Fourteenth Amendment due process rights, and his Eighth Amendment right against excessive punishment.[3]

The Court must first evaluate whether this claim was procedurally defaulted. If a habeas petitioner fails to object contemporaneously to a violation of his constitutional rights at trial, he is precluded from raising that violation in a later

---

isolated passages of misinformation do not indicate the kind of "wave of public passion" that would lead the court to presume prejudice on the part of the jury actually empaneled.  See, e.g., Patton, 467 U.S at 1037.

[3]  The Eighth Amendment issue is discussed in section F, *infra*.

habeas proceeding absent a showing of cause and prejudice.  See Wainwright v.

Sykes, 433 U.S. 72, 86 (1977).  If a state court of final review addresses the merits

of a claim that would be otherwise procedurally defaulted, however, a federal

habeas court may address the claim.  Victor v. Nebraska, 511 U.S. 1, 19 (1994).

In the present case, the Magistrate Judge found, and this Court agrees, that

the Georgia Supreme Court addressed the merits of Miller's claim in its opinion.

Miller v. State, 571 S.E.2d 788, 797 n.29.  Thus, this Court may also address the

claims on habeas review.

The Court's analysis begins with the statutes in question.  Miller was

convicted of felony murder (O.C.G.A. § 16-5-1(c)), aggravated assault

(O.C.G.A.§ 16-5-21), and aggravated battery (O.C.G.A. § 16-5-24).

The Georgia felony murder statute states, "[a] person commits the offense of

murder when, in the commission of a felony, he causes the death of another human

being irrespective of malice." O.C.G.A. § 16-5-1(c).  Under Georgia law, "the

theory of felony murder . . . depends on the transfer or imputation of malice from

the mens rea of the felonious assault to the killing."  Edge v. State, 414 S.E.2d 463,

464 (Ga. 1992).  In other words, "the fundamental justification for felony murder–a

murder without the element of malice–was the level of malicious intent associated

with a felony, especially a dangerous felony." <u>Id.</u> at n.2.

The aggravated assault statute provides:

> (a) A person commits the offense of aggravated assault when he or she assaults:
> (1) With intent to murder, to rape, or to rob;
> (2) With a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury . . . or
> (3) A person or persons without legal justification by discharging a firearm from within a motor vehicle toward a person or persons.

O.C.G.A. § 16-5-21(a).


The aggravated assault statute provides three ways in which aggravated assault can be committed. The second, at issue in this case, is when an assault is made using a weapon likely to or actually causing serious bodily injury.

It is undisputed that Miller did not strike Belluardo with a weapon. Miller struck all three blows in the attack with his hands and feet. Under Georgia law, "[h]ands are not deadly weapons per se, but may be considered deadly depending on their use, the wounds inflicted, and the surrounding circumstances." <u>Fleming v. The State</u>, 623 S.E.2d 696, 699 (Ga. App. 2005). Intent is not an element of the crime when a deadly weapon is deemed to have been used: "intent to injure is not

an element of aggravated assault with a deadly weapon when the assault is predicated on O.C.G.A. § 16-5-21(a)(2)." Jay v. State, 503 S.E.2d 563 (Ga. App. 1998). Jurors are not required to consider intent when determining whether hands are deadly weapons, but need only look at the circumstances and the injury. See, e.g., Miller, 571 S.E.2d at 793 n.7 (the State did not need "to show that [Miller] knew that his hands and feet, as used, were likely to result in the injuries sustained by [Belluardo]").

Aggravated battery occurs when a person "maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." O.C.G.A. § 16-5-24(a). For the purposes of the aggravated battery statute, Georgia law defines "malice" as action taken "intentionally and without justification or serious provocation." Wade v. State, 401 S.E.2d 701, 703 (Ga. 1991). "Malice" for aggravated battery does not require "specific intent" to cause bodily harm. Id. at 704.

Miller does not allege the jurors were improperly instructed under Georgia law regarding the elements of any of these offenses. Miller claims instead that the jury instructions as given permitted the jury to convict him of felony murder

without a finding of intent for any of the underlying felonies.  Miller argues that the instructions required the jury to presume intent as a matter of law rather than find it as a matter of fact.

"A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution."  Morissette v. United States, 342 U.S. 246, 250-51 (1952). It is axiomatic that where the intent element is "an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury."  Id. at 274. The issue of intent "can never be ruled as a question of law. . ." Id.  A "conclusive presumption [as to intent] which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense."  Id. at 275.

In Sandstrom v. Montana, 442 U.S. 510 (1979) the Supreme Court held unconstitutional a conviction for "deliberate murder" in which the jury was instructed that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."  Id. at 513.  The court found that, based on this instruction, the jury "could have concluded that upon proof by the State of the slaying, and of

additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state." Id. at 524.

Georgia courts have made clear that although intent to kill is not an element of felony murder, there is nonetheless an intent element in felony murder that must be proven by the state: the intent to commit the underlying felony. Edge v. State, 414 S.E.2d 463, 464 (Ga. 1992). Thus, if the jury were instructed in a way that might lead them to presume intent for the felony on which the felony murder charge was based from the fact of the "slaying, and of additional facts not themselves establishing the element of intent," then the jury would be required to engage in the kind of analysis found constitutionally defective in Sandstrom. Courts reviewing jury instructions for Sandstrom errors should review the jury charge in its entirety. See Devier v. Zant, 3 F.3d 1445, 1463 (11th Cir. 1993). The Court has done this.

In the present case, Petitioner was found guilty of two predicate felonies on which the felony murder conviction could have been based--aggravated assault and aggravated battery. The jury was not asked to and did not specify on which of these felonies the felony murder conviction was based.

-27-

With respect to intent generally, the jury was instructed: "[i]ntent is an essential element of any crime and must be proven by the State . . . . It may be inferred when it is the natural consequence of the act. . ." (T. at 2691.)  The court further instructed the jury, "Defendant will not be presumed to have acted with criminal intent."  (<u>Id.</u>)

With respect to the felony murder charge, the jury was instructed, "[a] person commits the crime of felony murder when, in the commission of a felony that person causes the death of another human being irrespective of malice or intent to cause the death of another." (<u>Id.</u> at 2967-68.)

With respect to the aggravated battery conviction, the jury was instructed that "a person commits aggravated battery when he maliciously causes bodily harm to another by depriving him of a member of his body or by rendering a member of his body useless."  (<u>Id.</u> at 2698.)  The jury was not instructed on the definition of malice.

With respect to the aggravated assault charge, the jury was instructed that "[a] person commits aggravated assault when that person assaults another person with a deadly weapon or with any object, device, or instrument which when used offensively against a person is likely to or actually does result in serious bodily

injury." (Id.)  Regarding the term "deadly weapon," the jury was instructed:

"Hands, if and when used in making an assault upon another person, are not deadly

weapons per se or as a matter of law, but may or may not be deadly weapons

depending on the manner in which they are used, the circumstances of the case,

[and] the[ir] lethal character. . ."   (Id.)

The jury, in essence, was instructed: (i) that no intent needed to be found to

find Miller guilty of felony murder; only the commission of an underlying felony

and a death; (ii) that no intent was required to find Miller guilty of aggravated

assault, only a simple assault and a finding that Miller's hands were deadly

weapons; (iii) that no intent was required to find Miller's hands deadly weapons;

and (iv) that aggravated battery occurred if Miller "maliciously" deprived

Belluardo of the use of a member of his body.

The instructions did not require the jury to find any form of intent with

respect to the aggravated assault charge.  The jury was instructed to decide whether

Miller's hands constituted deadly weapons based on the circumstances and the

lethal result of the blow, without considering intent.  The effect was that the jury

needed only further to find an intent to commit misdemeanor simple assault to find

guilt on the aggravated assault charge.  Once the jury had determined guilt on the

aggravated assault charge, the mere fact of Belluardo's death required Miller to be found guilty of felony murder.

These instructions lead to the result prohibited by <u>Sandstrom</u>: they "removed the presumption of innocence and relieved the state of the burden of proving beyond a reasonable doubt that [Miller] <u>intentionally</u> committed the felony of [aggravated assault]. . . ." <u>Hall v. Kelso</u>, 892 F.2d 1541 (11th Cir. 1990). Georgia law expressly recognizes that the intent element of felony murder is malice, inferred from the intent of the underlying <u>felony</u>. In the present case, because the Court does not know upon which felony the felony murder charge was based, it cannot tell whether the jury found any intent. To find guilt on the aggravated assault charge, the jury was required only to find intent for <u>misdemeanor</u> simple assault, in addition to the factually based finding that Miller's hands were weapons. Miller stipulated to that misdemeanor level of intent. The end result was that the jury was required to find Miller guilty of felony murder without finding any intent to support the underlying aggravated assault felony. The jury instructions thus violated Miller's Fourteenth Amendment due process rights.

Constitutional errors, however, do not "necessarily require the reversal of criminal convictions." <u>Rose v. Clark</u>, 478 U.S. 570, 576 (1986). If this Court can

"confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt," then the conviction should be affirmed despite the error. <u>Id.</u>  Error is harmless "where a reviewing court can find that the record developed at trial established guilt beyond a reasonable doubt." <u>Pope v. Illinois</u>, 481 U.S. 497, 502-03 (1987) (quotations and citations omitted).  In other words, if the facts found by the jury "conclusively establish intent," then the <u>Sandstrom</u> error is harmless and the conviction must be affirmed.  <u>Id.</u> at 503.  <u>See</u> <u>also</u> <u>Rose v. Clark</u>, 478 U.S. 570, 580-81 (1986).

Miller stipulated: (1) that he intentionally struck Belluardo in the back of the head; and (2) that he approached Belluardo from behind before striking him.  (T. at 2233).[4]

The testimony presented at the trial fell into four categories:

(A) Testimony that just prior to the incident, Miller and Belluardo argued and called each other names while on the school bus.  (<u>Id</u>. at 2253-55; 2322; 2339).

(B) Testimony that Miller ran up behind Belluardo, struck him quickly twice with his fists while Belluardo was standing, kicked him once on the ground after he

---

[4]  The parties agreed, and the laws of Georgia state, that these stipulations to the elements of misdemeanor crimes do not amount to stipulations of intent for felonies.  (T. at 2386)

fell, and then ran into the woods (Id. at 2291; 2304; 2314.)  The State's forensic

expert testified that Defendant died from a single blow to the head of "moderate"

force (Id. at 2539.)

(C) Testimony that, as a result of the argument between Miller and

Belluardo, and before the attack, Miller stated he wanted to hit or beat Belluardo.

The evidence on this point varied.  One student who rode the bus with Miller and

Belluardo testified that Miller had at one point said, "One of these days I'm going

to beat the hell out of my gay neighbor."  (T. at 2274.)  Another witness testified

that Miller threatened to "kick [Belluardo's] butt," but also testified that the

statement was not taken as a big deal at the time.  (Id. at 2331; 2335.)  Testimony

also showed that Belluardo challenged Miller to come back to his house and fight.

(Id. at 2322; 2339-40.)

(D) Testimony that after the attack, when the extent of Belluardo's injuries

became known, that Miller was surprised that Belluardo seemed seriously hurt and

expressed hope that he had not hurt Belluardo seriously.  (Id. at 2367-69.)

The State's closing argument relied on two facts in support of the aggravated

battery charge: (1) that Miller stipulated to striking Belluardo with the intent to

commit a misdemeanor battery; and (2) Belluardo suffered the deprivation of parts

of his body, namely his brain.  (T. at 2647.)

Under Georgia law, the "malice" required to commit aggravated battery is when a defendant acts "intentionally and without justification or serious bodily harm."  Wade v. State, 401S.E.2d at 704.[5]  Malice, in the context of aggravated battery, requires no "specific intent" to cause bodily harm.  Id.  Georgia's definition of "malice" for aggravated battery purposes is different from its definition of that word in the context of murder, where Georgia courts define it as, "evidence that the defendant acted with the deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof, [or] also by evidence that the defendant acted where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart."  Sheffield v. State, 635 S.E.2d 776, 779 (Ga. 2006).

The jury appears to have found beyond a reasonable doubt: (i) that Miller intentionally struck Belluardo three times; (ii) that Miller and Belluardo were arguing and calling each other names on the bus; and (iii) Miller threatened to beat

---

[5]  Although the jury received no charge from the Court on "malice" for aggravated battery, the State gave a reasonably accurate approximation of the correct legal standard in its closing argument.

Belluardo.  Taken together, these facts, found beyond a reasonable doubt, are conclusive on the issue of malice as defined by Georgia law.  These facts show that Miller punched Belluardo "intentionally," without "justification or serious provocation."  Although no fact in the record supports the proposition that Miller intended to kill or seriously injure Belluardo, or that Miller acted with "malice" as Georgia courts define it in the murder statute, these findings are not required under Georgia's interpretation of "malice" in the aggravated battery statute.  Therefore, this Court finds that the <u>Sandstrom</u> error with respect to the aggravated assault conviction is harmless in light of the aggravated battery conviction.

     E.    <u>Ground 5: The Georgia Common-Law Felony Murder Rule</u>

Miller objects that his conviction violated his Fourteenth Amendment due process rights and his Sixth Amendment right against double jeopardy.

The Georgia Supreme Court and the Magistrate Judge found that Miller waived this issue by failing to raise it at the earliest point at trial.  <u>Miller</u>, 571 S.E.2d at 797 n.29.  Under the collateral bar rule, this Court declines to rule on an issue found procedurally defaulted by the highest state court to review it, absent a showing of cause and prejudice or actual innocence.  <u>See</u> <u>Coleman</u>, 501 U.S. at 750.  Miller has not raised either contention here.  Instead, Miller contends that the

Georgia Supreme Court and Magistrate Judge erred by finding the argument waived, because he alleges to have raised it in his motion for directed verdict on the aggravated battery charge.  Miller does not dispute, however, that he failed to raise this issue squarely at trial, and alleges only that the prosecution raised it by mischaracterizing one of his arguments.  This issue is procedurally barred from consideration.

      F.     <u>Grounds 2 and 4: Eighth Amendment Issues</u>

In grounds 2 and 4 of his Petition, Miller argues that the life sentence he received violated the Eighth Amendment prohibition against cruel, unusual, or excessive punishment.  Miller's Eighth Amendment claim is that his life sentence, in light of his status as a juvenile and the unique factual and legal circumstances of his case, was unconstitutionally excessive.  Although the Magistrate Judge did not address this Eighth Amendment issue, likely because Miller addressed it only in passing, Miller again mentioned the alleged Eighth Amendment violation in his Objections to the R&R.

Miller does not appear to have raised an Eighth Amendment cruel and unusual punishment issue before the Georgia Supreme Court.  This issue is therefore unexhausted, and is procedurally barred from being raised in this federal

habeas proceeding, unless Miller can show cause and prejudice or establish that a fundamental miscarriage of justice, stemming from the denial of a constitutional right, would occur if the issue is not heard.  See Henderson v. Campbell, 353 F.3d 880 (11th Cir. 2003).  Miller does not claim cause and prejudice.  Miller, to the extent that he claims an exception at all, appears to rely on the proposition that his term of imprisonment constitutes a miscarriage of justice.

The "miscarriage of justice" exception is "exceedingly narrow in scope," and requires a showing of "actual, rather than legal innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quotations omitted).  The actual innocence requirement of the miscarriage of justice standard, which the Supreme Court has thus far applied only in the context of capital sentences, applies both to innocence of commission of the crime and innocence of the sentence imposed. The miscarriage of justice exception applies where a petitioner is "actually innocent" of "the crime of which he was convicted or the penalty which was imposed."  See Sawyer v. Whitley, 505 U.S. 333, 335 (1992).  In Sawyer, the Supreme Court held that the "miscarriage of justice" exception in the sentencing context applies when a court finds by clear and convincing evidence that "but for a constitutional error, no reasonable juror would have found the petitioner eligible

for the death penalty under applicable state law." Id. at 336.[6]

The Supreme Court has applied the "actual innocence" standard only to sentencing in capital cases, but has not held that the standard applies to non-capital sentences.  See Dretke v. Haley, 541 U .S. 386, 396 (2004) (observing that actual innocence claims "are likely to present equally difficult questions regarding the scope of the actual innocence exception itself.  Whether and to what extent the exception extends to noncapital sentencing error is just one example.").

In the present case, Miller appears to allege that the Eighth Amendment violation is that: (1) juvenile; who (2) did not act with intent to kill, to injure seriously, with wantonness, with disregard for human life, with traditional malice, or even with recklessness; and (3) committed an act for which death or serious injury was not a natural, probable, or foreseeable result; was (4) sentenced to life imprisonment with the possibility of parole, the minimum sentence allowed under the law.

The Sawyer standard does not translate well to the circumstances of this case.  Sawyer set forth its standard in the context of a capital sentencing hearing,

---

    [6] This standard makes sense in a death penalty case because a jury must consider the alleged aggravating and mitigating factors to determine whether to recommend imposition of the death penalty.

where a jury is charged with considering factual issues of mitigation or aggravation.  The standard in Sawyer is designed to address errors likely to arise in such a hearing, particularly evidentiary errors.  The Supreme Court has not articulated a standard to determine "actual innocence" of a sentence in a situation where, as here, the error alleged is not evidentiary, but legal, namely that the sentence of life with the possibility of parole--the most lenient sentence allowed for the felony murder conviction--if fully served, would be grossly disproportionate to the conduct and intent involved.

    To apply the actual innocence standard to Miller's case would require this Court to extend twice the Supreme Court's reasoning in Sawyer.  First, the Court would have to divine from Sawyer a new standard capable of addressing the present circumstances, and, second, the Court would have to extend the reasoning of Sawyer from capital to non-capital cases.  This Court is not entitled to extend Supreme Court precedent in this manner.[7]  Additionally, the Court would have to

---

[7] The Supreme Court has, over the years, increasingly recognized that juveniles must be treated differently than adults with regard to criminal punishment.  The Supreme Court has for some time recognized, "Children have a very special place in life which law should reflect. Legal theories ... lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children."  May v. Anderson, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring).  In Thompson v. Oklahoma, 487 U.S. 818 (1988), the Supreme Court

assume a fully discharged sentence--a prospect that, in light of the possibility of

parole, is speculative.  The Court cannot find by clear and convincing evidence that

Miller is "actually innocent" of the life sentence imposed upon him, and his Eighth

Amendment claim is defaulted.

The Court has deliberated over this case, in anguish, for a very long time.

---

held that the Eighth Amendment prohibited sentencing juveniles younger than 16 years old at the time of the offense to death.  The plurality opinion noted, "there are differences which must be accommodated in determining the rights and duties of children as compared with those of adults."  Id. at 823.  The court explained, "informing the judgment of the Court today is the virtue of consistency, for the very assumptions we make about our children when we legislate on their behalf tells us that it is likely cruel, and certainly unusual, to impose on a child a punishment that takes as its predicate the existence of a fully rational, choosing agent, who may be deterred by the harshest of sanctions and toward whom society may legitimately take a retributive stance."  Id. at 824. n.23.  The court reasoned, "[t]he reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult."  Id. at 835.

In Roper v. Simmons, 543 U.S. 551 (2005), the Supreme Court expanded Thompson, and held that the Eighth Amendment prohibits sentencing any juvenile younger than 18 years old at the time of the offense to death.  The court reasoned that the differences between juveniles and adults  "render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult."  Id. at 570 (internal quotations and citations omitted).  The court concluded that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult . . .."  Id.

The Supreme Court, however, has so far limited its consideration of juvenile Eighth Amendment rights to capital cases.  In the absence of authority to the contrary, this Court must do the same.

The case has raised issues involving the duties and experience of the Court as a jurist, former law enforcement official, lawyer, parent, and citizen.  The deliberation has been a constant collision of the values that attach to these various roles and responsibilities.  At the core, this case involves an attack by one youngster against another where the intent was to hurt, but certainly not to kill. Because a death occurred and a felony murder charge was brought against Miller, Georgia law required Miller, a juvenile, to be charged as an adult, subject to state superior court jurisdiction, for aggravated assault, aggravated battery, and felony murder.  Georgia law has no regard for what Miller intended, or even whether Belluardo's death was a foreseeable result of Miller's actions.  That this case could be charged, prosecuted, and sentenced as it was is a policy decision reserved to and made by the legislature of Georgia.  In the judgment of the Georgia legislature, teenagers charged with felony murder must be tried as adults and subjected to the punishments allowed–or, in this case, required–to be imposed on adults. Specifically, the charges on which Miller was convicted did not require any finding of serious moral culpability, but the law required the court to sentence him at least

to life with the possibility of parole.[8]

The injustice of a term of imprisonment that could last for the remainder of Miller's life is enabled by the unique structure of Georgia law, particularly the mechanical operation of its felony murder rule. Georgia is one of only three states that has a felony murder rule unlimited as to the predicate felony, requisite intent, or the foreseeability of the death.[9] Georgia is also one of a minority of states where 15-year olds are in some circumstances required to be tried and sentenced as adults without a transfer hearing, or any other process designed to safeguard their juvenile status. In combination, these minority legal positions caused the sentencing result in this unusual case.[10]

_____

[8] Parole may be a safeguard against the injustice of a life sentence, and may result in the practical imposition of a sentence that fairly vindicates Belluardo, his family, and his community, and fairly punishes Miller for his aggression against an innocent young man.

[9] The other states are Mississippi and Pennsylvania.

[10] A unique intersection of two aspects of Georgia law required Miller's life sentence: the juvenile transfer statute that mandated Miller be tried as an adult, (O.C.G.A. § 15-11-28(b)(1)), and the felony murder statute that mandated that Miller be imprisoned for life (O.C.G.A. § 16-5-1(c), (d)). Georgia stands in the minority with respect to both of these laws, and is one of only two states that has a statutory scheme which would require a life sentence to be imposed on a juvenile under the facts presented here.

Georgia law grants exclusive jurisdiction to the adult superior court over any juvenile over 13 years old accused of murder. O.C.G.A. § 15-11-28. This,

according to the Georgia Supreme Court, includes felony murder.  Miller, 571 S.E.2d at 793-94.  Georgia's broad felony murder rule grants to the superior court exclusive jurisdiction over any juvenile over 13 involved in any felony where a death occurs.  Because the superior court has exclusive jurisdiction, juveniles accused of felony murder must be tried as adults, and the juvenile court has no jurisdiction to hear the case.

In this regard, Georgia stands in the minority.  Most states have concurrent jurisdiction, require a transfer hearing to be held, or otherwise vest discretion in the courts in deciding whether a juvenile first offender under the age of 16 should be tried and sentenced as an adult.  See Alabama (Ala. Code 1975 § 12-15-34); Alaska (AK ST. § 47.12.100); Arkansas (A.C.A. § 9-27-318); California (West's Ann.Cal. Penal Code § 1170.17, 1170.19, People v. Thomas, 27 Cal.Rptr.3d 2 (2005)); Florida (West's F.S.A. § 985.226); Hawaii (HI ST § 571-22); Idaho (I.C. § 20-508); Illinois (705 ILCS 405/5-805) (providing mandatory transfer only for certain recidivist offenders or offenders involved in gang activity, and discretionary transfer otherwise); Indiana (IC 31-30-1-4); Iowa (I.C.A. §§ 232.8, 232.45); Kansas (KS ST § 38-1636); Kentucky (KRS §§ 640.010; 635.020); Louisiana (LSA-Ch.C. Arts. 857-862); Maine (15 M.R.S.A. § 3101); Minnesota (M.S.A. § 260B.101, 260B.125); Missouri (V.A.M.S. § 211.071); Nebraska (NE ST § 43-247); New Hampshire (N.H. Rev. Stat. § 169-B:24); New Jersey (N.J.S.A. 2A:4A-26); New Mexico (as to sentence, N.M.S.A. 1978 §§ 32A-2-19, 20); New York (McKinney's CPL § 180.75); Ohio (R.C. § 2152.10); Rhode Island (RI ST § 14-1-7.1); South Carolina (SC ST § 20-7-7605); South Dakota (SDCL §§ 26-11-3.1, 4); Tennessee (T.C.A. § 37-1-134); Texas (V.T.C.A., Family Code § 54.02); Utah (U.C.A. 1953 § 78-3a-603); Vermont (VT ST T. 33 § 5506); and Washington (West's RWCA § 13.40.110).

Only Mississippi and Pennsylvania have statutory schemes in which a juvenile like Miller would have been required to be brought to trial as an adult on charges of murder for similar conduct.  Mississippi, as discussed below, has a felony murder rule similar in most respects to Georgia's, and which requires life imprisonment as a minimum sentence.  Mississippi also has a jurisdictional exception for juveniles who have committed any crime "which if committed by an adult would be punishable . .. by life imprisonment or death. . ."  Miss. Code. Ann. § 43-21-151(1)(a).  Pennsylvania requires juveniles accused of murder to be tried

as adults.  42 Pa.C.S.A. §§ 6355, 6302.  Only in these states could the result have been the same.

States other than Georgia and Mississippi have automatic juvenile-to-adult transfer or jurisdiction provisions, but only Georgia and Mississippi have statutes permitting a juvenile like Miller to be tried for a crime for which life imprisonment was a required punishment.  Arizona, Virginia, and Washington, for example, require the automatic transfer to adult court of 15-year old juveniles accused of offenses that might fairly be charged from Miller's conduct.  A.R.S. § 13-501(A)(2), (5); Va. Code Ann. § 16.1-269.1(B); W.S.A. 938.18, 938.183.  If convicted as an adult for those offenses, however, Miller could not be sentenced to life in prison for his conduct.

Colorado, Montana, North Carolina, North Dakota, and Oklahoma provide for automatic adult court jurisdiction for juveniles accused of specified violent felonies.  C.R.S.A. § 19-2-517; MT ST §§ 41-5-206; N.C.G.S.A. § 7B-2200, ND ST 27-20-34; 10 Okl. Stat. Ann. § 7306-1.1. Miller's conduct, however, does meet the elements of any of these felonies, which require specific intent to kill, injure seriously, or maim, the actual use of a deadly weapon. Connecticut, Delaware, Maryland, West Virginia, and Texas provide for the automatic transfer of any juvenile accused of serious felony upon a finding of probable cause, but Miller could not be charged with murder or felony murder under the laws of those states.  C.G.S.A. §§ 46b-127, 53a-54a, 53a-54c; 10 Del. C. § 1010, 11 Del. C. § 636(2); M.D. Code, Courts and Proceedings, § 3-8A-03; W.Va. Code §§ 49-5-10(d), 61-2-1. Michigan, Massachusetts, and Nevada juvenile courts may also be denied jurisdiction over juveniles who have committed certain enumerated crimes.  M.C.L.A. 712A.2; M.G.L.A. 119 § 74, Com. v. Wojcik, 843 N.E.2d 716, 718 (Mass.App.Ct. 2006); N.R.S. § 62B.390.  The conduct and intent proven in Miller's case, however, does not meet the elements of any of these enumerated crimes.  Oregon provides for automatic adult jurisdiction for 15-years old who have committed felonies for which Miller might be liable, such as manslaughter and assault, but sets presumptive sentences well short of life imprisonment for juveniles convicted of those crimes.  O.R.S. § 137.707.

Putting aside the issue of Miller's age, Georgia's felony murder rule is rare in its breadth.  The Georgia felony murder rule does not require any finding of intent or foreseeability, nor does Georgia limit the application of the rule to

Further, the discretionary choice to file the felony murder charge was, considering

────────────────────

inherently dangerous felonies from which a morally culpable intent may be fairly
presumed.

Most states have restricted the application of the felony murder rule to
specific enumerated dangerous felonies, such as arson, robbery, and rape, crimes
generally committed intentionally.  A minority of states have broad common-law
based felony murder statutes similar to Georgia's.  Most of these minority position
states, however, have instituted specific statutory or judicial limitations concerning
the conduct that can be punished or the sentence that can be imposed.  The
limitations adopted by these states guard against the harsh sentencing result to
which Miller was subjected for similar conduct.  See, e.g., Delaware (11 Del. C. §
636(2)); Illinois (720 ILCS 5/9-1, 5/12-4, People v. Boyd, 825 N.E.2d 364, 369-70
(Ill.App. 2005)); Massachusetts (Com. v. Baez, 694 N.E.2d. 1269 (Mass. 1998));
Nevada ( Sheriff, Clark County v. Morris, 659 P.2d 852 (Nev. 1983));  New
Mexico ( State v. Harrison, 564 P.2d 1321, 1324 (N.M. 1977) (superceded on other
grounds at 702 P.2d 1001 (N.M. 1985)); Pennsylvania (Com. v. Middleton, 467
A.2d 841 (Pa. Super. 1983)); Montana (MT ST 45-5-102); Oklahoma (21 Okl.
St.Ann. § 701.9);  Minnesota (M.S.A. § 609.19); Washington ( West's R.C.W.A.
9A.32.050); Missouri (V.A.M.S. §§ 565.021, 558.011);  Wisconsin (W.S.A.
940.03); Iowa ( State v. Heemstra, 721 N.W.2d 549, 558 (Iowa 2006)).
Mississippi enumerates dangerous felonies that serve as the predicate for a capital
murder charge, and categorizes all other felonies as predicates for non-capital
murder.  Miss. Code Ann. § 97-3-19.  Non-capital murder convictions in
Mississippi carry mandatory life sentences.  Id. § 97-3-21.  Pennsylvania permits
convictions of second-degree murder to be had when any death occurs during the
commission of a felony, and second-degree murder carries a mandatory sentence of
life imprisonment.  18 Pa.C.S.A. § 2502.

Thus, forty-seven states would not have required Miller to be tried as adult,
convicted of felony murder, and sentenced to life imprisonment.  Only Mississippi,
Pennsylvania, and Georgia have laws which require a sentence of at least life
imprisonment for any death in connection with any felony, even where the
underlying felony does not require morally culpable intent, and even where the act
is committed by a 15-year old without a criminal history.

-44-

the rare circumstances of this case, unfortunate.

No matter how unfair the sentence, the Court is bound to follow the law. The law demands that the state of Georgia be given the first chance to address the proportionality of Miller's sentence.  "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures."  Henderson v. Campbell, 353 F.3d 880 (11th Cir. 2003).  Miller's failure to raise this issue on appeal to the Georgia Supreme Court is thus determinative.  The Court, however, urges Miller's counsel to explore a way to present Miller's claims concerning the proportionality of his sentence to the Georgia state courts.  This process advances the important interests of federalism, and is what the law requires.  The state courts of Georgia should have the first chance to consider Miller's sentence in light of the Supreme Court's decisions in Enmund v. Florida, 458 U.S. 782 (1982), Solem v. Helm, 463 U.S. 277 (1983), Thompson v. Oklahoma, 487 U.S. 815 (1988), Atkins v. Virginia, 536 U.S. 304 (2002), and Roper v. Simmons, 543 U.S. 551 (2005).[11]  That is, the

---

[11]  Roper, the Supreme Court's clearest statement to date on the particular care that states should exercise with regard to juveniles accused of criminal conduct, was not yet decided on October 28, 2002, the day the Georgia Supreme Court issued its opinion in Miller's case.  In Roper, the Supreme Court considered the constitutionality of sentencing juveniles to death.  Simmons, the petitioner in

Georgia state courts must first be allowed to evaluate whether the sentenced imposed on the juvenile in this case is constitutionally allowed.

**III.   CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Miller's Objection to Magistrates Report and Recommendation [9] are **OVERRULED**.  The Court **ADOPTS AS ITS ORDER** the Report and Recommendation, as supplemented by this Opinion and Order.

**IT IS FURTHER ORDERED** the Petition for Habeas Corpus is **DENIED**.

**SO ORDERED**, this 26th day of February, 2007.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE


_____

Roper, first filed unsuccessful state and federal habeas petitions.  In 2002, the Supreme Court decided Atkins.  After the Supreme Court announced the opinion in Atkins, Simmons filed a new petition for postconviction relief with the Missouri Supreme Court in light of the principles expressed in Atkins.  The Missouri Supreme Court then granted the petition and set aside his death sentence.